This morning is 23-1229 Well Cell Global v. Calvit. Good morning, may it please the court. My name is Jamil Alibi and I represent the appellants. The court's injunction below falls into three problematic categories which require traversal. Is there any stuff that remains controversial? We couldn't find the motion for the P.I. in this case wasn't included in the appendix and it's included in the district court docket under seal. Is there any reason it's under seal anymore? Not that I'm aware of but I do know that parts of the record that were designated as confidential were designated by the appellees. Thank you. With respect to those three issues, the first is the likelihood of success on the marriage. With respect to the patent claim, there's no assertion of a particular claim. There's no discussion of a particular claim. There's no claim construction. And with respect to the trade secret, although there's discussion Let's talk about that. The district court relied on, I read her having made an assumption that the license that presented injury kind of was the be all and end all answer to the fact that there was infringement on these specific claims. And then she thought, she therefore thought she didn't have to go any further in her analysis. The burden was shifted to you. You have to show how what you're doing now is different from what you were doing in the license. So I'm asking you historically, in this case, is there at any point, is there a document or anything in this record that would indicate that you had stipulated or that you agreed that during the license period you were practicing all of the steps in the patent? No. And if you look at the agreement that is the license, in paragraph two of it, it goes well beyond the patents. It just uses the phrase intellectual property and it uses what I would consider confidential information, neither of which would rise to the level of either a patent or a trade secret. And thus, in this particular case, the district court does say let's look at patent infringement for two pages and let's look at trade secret for three pages. And also makes clear that this is not an injunction based upon trademark infringement or a breach of the license agreement. And it does read like that, Your Honor. Judge Post, you're right that it looks like the judge is saying, well, if you're doing anything that you did before, then I think there's a problem that needs to be enjoined. But the issue is that the plaintiffs sought an injunction based upon patent infringement and trade secret misappropriation only, and thus had the burden to prove that those two things were happening, and didn't do so. One of your concerns is with respect to claim construction. Did the parties actually propose any terms for construction and provide any proposed construction? It never got to that point, because during the evidentiary part of the hearing, the plaintiff never mentioned a particular claim or an accused device and tried to map it together or try to say let's show how the ten limitations of claim one are met, for example. And so we never got to that issue. But if you want a specific example, I would say that at one point the Court mentions this phrase about data storage and says that might mean a data room. That's the opinion of Defendant 17. Well, that's a defined term. Data storage means computer-readable medium in the specification of the patent at 2042. And so just by not looking into the particular claims with enough specificity, the District Court was led into error because it never had a chance to look at a claim versus a product or a service and match those things together. And this Court's opinion last year in ABC Corp makes it clear that that's required in order to enter an injunction. So are you saying that when your client was working and running these businesses while under the license it wasn't practicing the patented invention? There's no evidence that they were practicing the patent invention. I think that there was evidence that they were given information about how to do some of the things that this company believes that it does. The license entitled them to practice the patent invention. It certainly would have entitled them to do so. But these patent claims are long and have a lot of steps to them. And whether they're being done or not is not anywhere in this record. What about the irreparable harm problem? I could ask them, but is WellSell practiced any of this stuff or are they just a licensing? So we've got to divide up the two WellSell entities. There's WellSell Global, which is supposed to be the IP holding entity. Then there's WellSell Support, which is the licensor to all these other entities. The evidence is that there's 140 licensees and eight are added every other week. So they don't practice it, they just license it? There's some evidence that they might have two facilities that WellSell Support. When you were the licensee at first and then post-license when the license terminated, would one of your clients, or I don't know what they're called, would they know, do you have WellSell all over your website or on your equipment or whatever? Would somebody coming in, and let's assume they objected to your practices or thought you weren't very good, would they have any reason to associate what you're doing with what WellSell does? No, Your Honor. And, in fact, there's testimony in the record that the types of devices that can be used to do this infusion of insulin are made by multiple manufacturers, and so it's not a WellSell device. What WellSell is trying to claim is that it somehow optimized the infusion of insulin, but it has nothing to do with a particular device. What about on your training materials? They argued a lot about how you're using your training stuff, right? Their training materials they provided said WellSell, but those were returned pursuant to the court's injunction. So there's no use of any WellSell materials, and nor is that an issue for either Trade Secret or Patent. Let me ask you to move on to just the 101 issue. The district court in the interim, my understanding is, is the district court dealt with your 12B6 on the 101 issue? You're correct that the district court ruled on the motion to dismiss, which raised a 101 issue. Right. And declined at that time, finding that it was too premature to do so at the motion to dismiss stage. So what's anything next? Are you filing for summary judgment? Are you just on hold? Actually, the district court also stayed the district court proceeding pending this court's decision after this court stayed the injunction. So it went further. It stayed the entire case. Oh, OK. And so the case has stayed pending Your Honor's decision. But we believe that that decision with respect to the motion to dismiss and also the failure to consider that invalidity issue at the preliminary injunction stage. Well, that's another issue. That's a separate issue before us. That's correct. I'm assuming that we assume hypothetically we will reject that. So then where are you left on the 101? You'll reject it on the basis that it was not adequately preserved before the district court. That's just a hypothetical. Sure. And it was presented in a supplemental brief the day before the hearing started. But the 101 issue, we believe, is on the face of this patent. I mean, I think that whether it's relating to a natural law issue that this court decided in chromodex where you found that the NF was in milk, here we're talking about infusing insulin. Why don't you make more of it? Because even on the waiver issue that's before us, not only did you not raise it in that day at the hearing, the oral hearing with the district court judge, which is a problem for you, I think. But when I look back at the papers, you didn't make a very fulsome one-on-one argument in the papers that were before here with respect to the injunction. It was a two-page argument in a supplemental brief, but there was a four-page section of the motion to dismiss which was incorporated into the supplemental brief that raised this 101 issue. So the motion to dismiss was incorporated in the supplemental brief responding to the PI? That's correct. Appendix 547 incorporated the motion to dismiss and pages 178 to 184 address the section 101 challenge. And so there was no need to brief it again. It had already been briefed and was still pending. And we thought the motion to dismiss was important to be decided first because it even raised it. What section was it incorporated in of that paper? Was it incorporated in the argument section? It was incorporated at the beginning of the brief. Right. Which was really more just an update of the current proceedings section. Correct. At the beginning of the motion. So it wasn't in the argument section, which is, hey, also we think there's a 101 problem. Incorporated by reference is our now pending motion to dismiss. There's a separate 101 section, I agree, that's in the brief. It doesn't incorporate it in that spot. I don't think federal rules, so procedure 10 requires that. Well, I guess what I'm trying to figure out is, is that a sufficient signal to the district court that you're really putting 101 in play or you're really injecting the entire motion to dismiss into this paper if it's only up in the earlier section of the brief, which is just talking about the current status of the proceedings within the court. Two reasons that I say it would be. Number one is that on the second day of the hearing, this was a two-day hearing, and I understand the statement was made on the first day of the hearing by trial counsel. But on the second day, he asked that, he said, the only thing I'd ask is we submitted some supplemental briefings filed last Friday. As long as the court will consider that, we don't have a need for further arguments. And so the court said, very good. And so the hearing ended. But what was the play between that and the motion to dismiss? I thought you started to say that you were contemplating or hoping that the motion to dismiss would be disposed of before the PI was disposed of. My point was that the motion to dismiss was important because it raised an issue of personal jurisdiction, and the district court should have addressed that first. In fact, the district court entered an injunction against two individuals and then on the motion to dismiss decided that she did not have personal jurisdiction over those individuals and dismissed them from the case. We believe that should have been addressed before. So those types of issues that were raised in the motion to dismiss were also relevant to the pending injunction proceedings. If we were to agree with you, hypothetically, that the injunction was the rationality position, are you seeking a reversal or just a reaming? We think that the injunction should be reversed and vacated because we think that the problems with respect to a failure to show a substantial likelihood of success on the patent claim was an obligation that the plaintiff had and didn't meet that obligation. It didn't address a question of invalidity that had been raised. And with respect to the trade secrets, didn't identify the trade secret, all six factors that the Fifth Circuit requires. Well, so I was asking you is it a reversal or a vacate, and you said it's a reversal and a vacate. Well, a vacate is what I would say because it should not be remanded for further proceedings because the plaintiff had the opportunity to meet its burden and didn't do so. It should be vacated. That would require us to go delve into the briefing and examine for ourselves whether there was a total failure of proof in the presentation in the briefing. That's a different exercise than just looking at the face of the district court opinion and saying, uh-oh, the district court opinion has a bunch of holes in it. And so for that reason, the district court needs to do it over again. I agree with you except that here... Do we have all the briefings? You don't have all the briefings. But you have... So then we can't make that assessment, can we, that there was a total failure of proof by the plaintiff and that would therefore result in an outright reversal as opposed to a vacate, remand, do-over by the district court? I believe you can because there's only two pieces, two sets of evidence, the Hepford testimony and the Calvert testimony. So based on the evidence, you can make that determination. I would also point out that on the face of this injunction, based on this court's decisions in ABC and CellGuard, that you can make the determination that this does not meet the Rule 52... Is there anything stopping the parties from giving this court the full briefing on the PI? Absolutely not. What about... Oh, just briefly, can we talk about the trade secret aspect? And to the extent you can speak about it in open court, what can you tell me is where I can look for a good identification of the trade secret? You're not going to find it. You're going to find that in Appendix 20 there's a discussion of know-how and show-how and that the district court relies on, which is the testimony of the CEO, of the plaintiff, and that there is never an analysis of the six factors that the Fifth Circuit talks about in the Heil case, applying those to a particular trade secret, and then, more importantly, showing use. Back to Judge Prost's point, everything was based upon the fact that there might have been access prior to the time that the license was terminated. There's no showing of use after the license was terminated. Thank you, Your Honor. Good morning, Your Honors. My name is Lama Barazi, and I'm here on behalf of the Applees, WealthSol Global and WealthSol Support. Did you identify any assert claims as part of the PI motion? Were claims brought to the table? We asserted all of the claims in the 990 patent and the 595 patent. Which patent claim was the judge focusing on when it concluded there was a likelihood of success of infringement of the patent? I believe the judge was focused on Claim 1 of the 990 patent. So where in Claim 1 is there something that relates to a, I don't know, a data encryption room or something like that? She made reference to that, and I just got lost looking at Claim 1, the first claim of this patent, where whatever she was thinking about with respect to that term lines up with any claim limitation for Claim 1. I believe the data encryption reference is in one of the dependent claims of Claim 1. So where can you point us to? Do you know which one? Not off the top of my head. Where can you point us to in the opinion itself so that we would see that the judge was focusing on Claim 1? Is there a page you can point us to? Well, on page 15 of the court's findings of facts and conclusions of law, the court defines the scope of the 990 patent as claims, that it claims protocols used to determine dosing ranges as part of WellSell's patented modality. And that's in reference to Claim 1 of the 990 patent. Do you understand how this case, when it comes to preliminary injunction decisions, it stands apart from what we're normally used to looking at because we're normally used to looking at a claim of the patent being compared to an accused product or an accused method. And then on a limitation-by-limitation basis, the district court walks through and explains why he or she is convinced that it is likely that the defendant is performing all of these claim steps or has a product that includes all of these recidivic elements. And we don't have that kind of analysis here. Yes, Judge, I understand that it's a little bit different. However, I had the opportunity to depose Sean Talbot for a full day, and I stepped him through the entire 990 patent, and I stepped him through it in depth, and I specifically stepped him through all the limitations of Claim 1 of the 990 patent. And he admitted that Insulinic practiced all the limitations, even after the termination of the licenses. Do you have the site for that? I don't have a specific site offhand, but I can certainly get it to you. Did the district court refer to that? Judge, I believe the district court took into consideration Sean Talbot's deposition as well as Scott Hepford's depositions. And the court, in its findings of fact and conclusions of law, referred to them extensively. But does she ever say that I conclude that Talbot was, during the period of the license, Talbot was infringing and practicing every step of the patented claims that are at issue? I don't believe it's said in that kind of clarity. However, the court did find that Sean Talbot was unable to distinguish between the insulin infusion modality that he was using, that Insulinic was using, as opposed to WellSell's modality. Yeah, but I know, but you understand the problem that we're having. This goes, the burdens here were completely shifted from what ought to be, what is generally done in a PI. She put the burden on the other side. That's not the way it works. My understanding of why one would do that or how one could get away with doing that, perhaps, is if it was uncontroverted that for 10 years they had been practicing every step of the patent. And they stipulated to that. And then she says, well, okay, if that's true, then you've got to tell me how you've changed. But I don't see any of that in her opinion or in the record in terms of a conclusion that for 10 years under the license they were practicing every step of the claim. Judge, if I may, in Sean Talbot's deposition testimony, he admitted during the entire time that Insulinic had a, Insulinic of Hialeah and Insulinic of Lafayette had a license with WellSell, they were practicing the WellSell modality and practicing all the limitations of Claim 1 of the 990 patent. He admitted to all that. Is that in the actual district court's order? I do not believe it is. But I believe the court was relying on the deposition and drew from that deposition in order to make this analysis. How do we know that? How would we know that? I mean, what's the basis for your belief that you're saying that? Well, the court refers several times to Sean Talbot's deposition. It refers several times to its inability to give him any credibility. So that's how we know that the court did take into consideration. Look at page appendix 18, because here I've got the right document. I think she's talking about Talbot's testimony. So if she was going to say that, I think it would be on that page. Yes. So there's that paragraph. Are you referring to the trade secrets, Judge?  Because throughout the order, she refers to Sean Talbot's deposition testimony in different sections. Okay. Well, look at 18, because I think here she's talking about the 990 patent. Talbot testified that the therapy the defendants now performed is similar in that we are still putting into some of these amounts that was just indicated that defendants used. And that's the analysis, right? I mean, that's the extent of her analysis on what they were doing before and what they're doing now, right? Well, I believe the court found that Sean Talbot wasn't able to materially differentiate between the modality that the insulinic was practicing as opposed to Wellsell's modality. And there was testimony on the record during his deposition that they were utilizing and practicing every limitation of the 990 patent post-termination of the licenses. Were you ever worried about this order? Did you ever say, Court, could you do some additional findings and point out these things you're talking about with the testimony or anything like that? Was there any additional communication asking for a little bit more specificity? We did not do that, Judge. It would be really handy to get the site for the deposition testimony where Talbot purportedly conceded that the defendants are performing every limitation of any of the 990 patent claims post-termination of the license. Certainly, Judge. I can certainly provide that post-hearing. What about trade secrets? There's no specificity either on trade secrets. Based on the opinion, we have no idea what the analysis was or what the trade secrets even were. Judge, during the two-day evidentiary hearing, Scott Hepford testified as to Wellsell's trade secrets. How many trade secrets are we talking about? There are multiple. The trade secrets include the exact dosaging protocols for the insulin infusion. It includes hundreds of hours of training that were provided to insulinic defendants. It includes tables, algorithms. It includes handbooks, training materials. Where can we look in the appendix to find all these trade secrets you're identifying? The findings of fact and conclusions of law outline the trade secrets. Judge? Give us a page. And while I look for that, if I may, Yes. Well, page 15 of the findings of fact and conclusions of law of the district court states that Is this A15 or is this Do you know the JA side? No. Okay. No, it's not. It's not. That's a different order. The court noted in the order that while the 990, claim one of the 990 patent gives the basic overall modality for the Wellsell physiological insulin resistance protocol, it doesn't specify the exact therapeutic ranges. Those are trade secrets. It doesn't specify the exact dosaging protocols. Those are all trade secrets that are kept in this encrypted data room. Would appendix page 2 be a summary of the trade secrets in paragraph 4? Appendix page 2, paragraph 4, is that a summary of the trade secrets? Do you have access to the appendix? I'm trying to look through it. There are several different volumes. Well, I think we're appendix page 2, so I'm assuming that's going to be volume 1. Yes, Judge. I'm there. Page 2 I have as the preliminary injunction order. Is paragraph 4 a summary of what you're contending the trade secrets are? Yes, that is a summary. I guess the struggle I'm having is these are topics. These aren't the actual trade secrets themselves. So it's hard to know and be convinced that trade secrets even exist just by listing off the topics in which there are alleged trade secrets. I mean, saying specialized medical training is your trade secret is not enough to tell me whether, in fact, there is a trade secret. Saying specialized medical training, I mean, for lack of better words, is an abstract idea. Yes, Judge, and I think for purposes of this order, which is public, Judge Rosenthal didn't go into depth about what the trade secrets are, but during the testimony by Scott Hepford, he went into depth about the algorithms, the dosaging protocols, and the therapeutic ranges for which to administer the insulin infusion.  Yes, the problem for us is we generally, you know, we're reviewing her decision. I mean, we obviously go through the entire record, but it's kind of hard to even know what she relied on in reaching inclusion. Before your time runs out, I just want to ask you about irreparable harm because here, too, her analysis seems pretty truncated, and I guess it seems that she's relying on what Mr. Hepford said that seems quite speculative in terms of what the risk is here. I mean, the irreparable harm is usually to competing people or if they're using Well-Cell's name and they're doing the product. Here, I thought most of the problems here were related to the fact that they allegedly were misfilling their patients, which is not a reflection on Well-Cell, as far as I can tell. So I'm not clear on what the basis for this irreparable harm is. The irreparable harm is that Insulinic was a licensee, and it's using the Well-Cell modality. And so any kind of misstep that Insulinic would perform would reflect poorly on Well-Cell, and it would damage its reputation and its goodwill. What's the likelihood that they would be performing the infringing method improperly? There's a high likelihood, Judge. How do we know that? Scott Hepford testified at the evidentiary hearing about the potential for harm in not performing the modality in the proper way. Right. That's true for licensees as well, as well as let's just say they're infringing. So they're non-licensed infringers. If they do it wrong, then there's going to be some harm to the patients. But we don't know what the likelihood of that harm is, and we also don't know the likelihood of any improper execution of the patented method by the defendants somehow getting back to getting the blame pinned on the plaintiffs either. Judge, we have an issue because some of the defendants were licensees, and then there are other defendants who are not licensees and who never received any kind of training from Well-Cell. And so that especially poses a significant harm and risk to the public because in order to administer this modality, you have to go through significant training, hundreds of hours of training. And not doing that- So why would that point to Well-Cell? That would point to Well-Cell because it would be a reflection of Well-Cell's technology, Well-Cell's IP. Okay, we're out of time. Can we get from the parties a copy of all briefing related to the preliminary injunction below? Certainly, Judge. I'll have that to you today. Thank you. Four points. Data storage is in Claim 19, not in Claim 1 or to Medical Name. The CalVit testimony shows that he did not know about certain limitations, Appendix 2740, 2776. There are metabolic factor and insulin sensitivity factors. He didn't know what they were, couldn't testify to them whatsoever. Then there's the weight management protocol. So you're saying that he did not acknowledge- Absolutely not, Your Honor. And he didn't practice all the steps. And it's APPX 3028 and 3031 regarding the weight management protocol limitations. You asked a question about what the trade secrets are. They were told today that they are the dosing protocol. Mr. Hepford testified at APX 1605 that it's disclosed in the patent, that the range is disclosed in the patent. Under this Court's decision in Accident Packaging, under the Fifth Circuit Trilogic's test, the patent and the trade secret, if they cover the same subject matter, it's not a trade secret. The second thing that you heard today was that there was an algorithm. Appellee's brief at 35 says it's the algorithm. The algorithm is the 595 patent, according to the Court below, and APPX 16 where she was quoting Mr. Hepford who said that at 1607-8. There's no- The one thing I want to say, though, on the patent versus trade secret, I looked at some of that testimony, I guess 1605, and I think they were trying to say, or at least the opponent was trying to say that there was a difference between what was disclosed in the patent, and then there was some more detail that was really the real crux of the trade secret, so to speak. Like there was some delta there. Do you get what I'm saying? I understand what you're saying, and I can't find any evidence of it in the record. It's not referenced anywhere by the district court, and I'll point out to Your Honor that tabs 27 and 28 of the appendix is where Mr. Hepford testified. That's not under seal. So if he was testifying about trade secrets at this injunction hearing, he did it at a public hearing, and so it's definitely not a trade secret, and I can't see either where there's identification of a specific improvement upon that patented technology that's then being used, and because both of those failures occur, there is no trade secret misappropriation. Thank you. Thank you.